UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION  NO. 11-12095-RGS

MATTHEW BRADBURY

v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY

MEMORANDUM AND ORDER ON APPELLANT'S
MOTION TO REVERSE AND APPELLEE'S MOTION TO AFFIRM
THE DECISION OF THE COMMISSIONER

January 10, 2013

STEARNS, D.J.

Appellant Matthew Bradbury seeks review of a final decision of the Commissioner of Social Security that he is not disabled within the meaning of the implementing regulations of the Social Security Act.  *See* 20 C.F.R. § 404.1520(f).  On May 20, 2011, after an evidentiary hearing, Administrative Law Judge (ALJ) J. Alan Mackay found that, while Bradbury is unable to return to his past relevant work, a significant numbers of jobs exist in the national economy that he can, despite his physical limitations, perform.

The Appeals Council denied Bradbury's request for a review of the ALJ's

decision on September 23, 2011, thereby affirming the decision of the ALJ as that of the Commissioner. Bradbury now seeks to reverse (or remand) the decision of the Commissioner. The Commissioner, for his part, cross-moves for an affirmance of the ALJ's decision. Jurisdiction properly vests in this court pursuant to 42 U.S.C. § 405(g). The issues on appeal are: (1) whether the ALJ's decision is supported by substantial evidence; (2) whether the ALJ mischaracterized the evidence, particularly in finding that Bradbury's testimony was not credible; and (3) whether the ALJ misapplied the controlling law.

## BACKGROUND

Bradbury was 37 years old when he first applied to the Social Security Administration for supplemental security income and disability insurance benefits. He is now 41. He lives with his mother and son in Braintree, Massachusetts. Bradbury has a high school education. He has worked intermittently in the construction industry as a laborer. In 1995, Bradbury suffered a back injury, which he claims has progressed over time into degenerative disc disease that prevents him from working at his regular occupation as a manual laborer. Bradbury has not engaged in gainful employment since August 17, 2007.

The documented treatment history dates from June of 2007, when Bradbury presented at the emergency room of South Shore Hospital complaining of lower back

pain. An MRI indicated posterior disc bulges at L4-5 and L5-S1 with no neural impingement, but possible mild disc space narrowing at L2-3 and L3-4. In October, and again in December of 2007, Bradbury sought emergency treatment, complaining on both occasions of pain radiating into his buttocks and right leg and weakness in his foot and ankle.

In December of 2007, Bradbury began treating with Dr. Patrick Madden, a neurologist. Dr. Madden noted an absent right ankle jerk[1], but intact motor sensation and coordination and normal heel to toe tandem walking. An EMG taken of Bradbury on January 9, 2008, revealed radiculopathy at both L-5 (mild chronic) and S-1 (moderate chronic). R. at 308. Dr. Madden prescribed Naprosyn (an anti-inflammatory medication) and recommended that Bradbury stop smoking and get more exercise. In March of 2008, Bradbury underwent an MRI. The MRI indicated mild kyphotic positioning[2] centered at C4-5 and mild mid-cervical spondylosis,[3] but no impingement, no foraminal stenosis, and no cord lesion. A lumbar MRI indicated an L5-S1 protrusion borderline touching the proximal right sciatic nerve root. In July of 2008, Bradbury complained of stiffness in his

---

[1] An absent ankle jerk is a failure of proper reflexes when the ankle is stimulated. It is frequently associated with nerve root compression.

[2] Kyphotic positioning is the curving of the upper back beyond 50 degrees.

[3] Spondylosis is the occurrence of bony outgrowths on the spine that occur normally as part of the ageing process.

neck and numbness in his thigh, but also reported that physical therapy for his low back pain "helped a lot." Bradbury saw a neurosurgeon, Dr. Frederick L. Mansfield, in October of 2009. Dr. Mansfield found

> no real tenderness over the spinous process, SI joints or sciatic notches. He can walk on his heels and his toes. He can do a deep knee bend. Manual motor testing and sensory testing is intact. Strait-leg raise is negative.

R. at 286. After a review of the medical records and a physical examination, Dr. Mansfield diagnosed Bradbury with discogenic low-back pain from L-5 and/or S.1 discs. He explained to Bradbury that, given his condition, surgery would have to be done anteriorly, and that the rate of success was "70% to 80% in non-smokers and less than that in a smoker." *Id.* Dr. Mansfield noted that

> undertaking surgery is a gamble. It shouldn't be done unless [he] is able to stop smoking. In the meantime he'll try another course of physical therapy and use non-steroidal anti-inflammatories. If he decides that he is able to quit smoking and he wants to proceed [Dr. Mansfield] would do a four-level discogram L.2-L.3 to L.5 to S.1. I told him that if more discs seemed to be involved, he would not be a good candidate for surgery.

*Id.*

In February of 2009, Bradbury sought "another opinion" about his back pain from Dr. Patrick Connolly, an orthopedic surgeon at UMass Memorial Medical Center. Dr. Connolly examined Bradbury and noted diminished but symmetric reflexes and normal strength in the relevant muscle groups. He recommended against surgery because "the

4

likelihood of an operation significantly improving his disability getting him back to the concrete work in [his] opinion is pretty close to 0." *Id.* at 353. Dr. Connolly found Bradbury to be "temporarily totally disabled" in light of his lack of work skills other than for heavy labor. Dr. Connolly noted that Bradbury was "a relatively young guy" and recommended that he try to manage his pain ("he is not going to be pain free") "with nonsteroidal anti-inflammatory medications, get involved with general fitness and exercise and get a new trait that he can work in a sedentary or light duty or light labor capacity." *Id.*

In May of 2009, Bradbury sought emergency room care for low back and right knee pain, and although his physical examination was unremarkable, an EMG indicated mild to moderate C8 radiculopathy.[4] Bradbury returned to the emergency room in September and again in October of 2009, and was prescribed Percocet and Oxycodone, although physical examinations showed him capable of normal mobility.

In November of 2009, Bradbury started treatment with Dr. Walter Goula, an internist. On examining Bradbury, Dr. Goula found mildly decreased strength and sensation on Bradbury's left side, but intact sensation bilaterally. Noting that Bradbury "was a pleasant man in no distress," Dr. Goula diagnosed Bradbury with lumbrosacral

---

[4] Radiculopathy is a compressed nerve in the spine (usually lower back or neck) causing pain and weakness.

5

disc disease,[5] and prescribed Percocet, Flexeril, and Motrin. During a December of 2009 visit, Dr. Goula noted that Bradbury "was started on Percocet and Flexeril [and was] doing very well." *Id.* at 588. In a follow-up examination on December 29, 2009, Bradbury reported that his pain was "a bit worse" and that stretching exercises and physical therapy provided "no improvement." *Id.* at 586-587. Dr. Goula referred Bradbury to Dr. Rafael Altieri for another MRI. Dr. Altieri found that "the vertebral bodies . . . and bone marrow signal is normal." While Dr. Altieri noted a disc protrusion in L5-S1, he found "no significant deflection or impingement . . . [and] no limiting central stenosis." R. at 535. At L4-L5, he found "no limiting central or foraminal stenosis . . . [and] no other significant posterior disc bulge or herniation was seen." *Id.* Based on Bradbury's March 2008 MRI, Dr. Altieri found "[n]o significant change in central disc protrusion at L-5-S1 with a right paracentral component just contacting the right S1 nerve root. Stable small central annular tear with minimal bulging at L-4-L-5." *Id.*

During a February of 2010 appointment, Bradbury reported improved sleep. Dr. Goula noted that Bradbury was stable and recommended no change in his medications. In March of 2010, Bradbury told Dr. Goula that he was "doing well overall" and had made an effort to increase his level of activity. In April of 2010, Dr. Goula submitted a

---

[5] Lumbrosacral disc disease involves a compression of the nerve roots in the lower portion of the spine.

Medical Source Statement in which he opined that Bradbury was able to sit, stand and/or walk for up to 1 hour at a time, was able to sit and stand for up to 3 hours total in an 8-hour day and walk up to 2 hours total in an 8-hour day, required a sit/stand option, was able to lift and carry up to 5 pounds, was able to use his hands for repetitive actions such as simple grasping, pushing and pulling of arms controls and fine manipulations, was unable to use both feet for repetitive movements of pushing and pulling, was able to occasionally bend and reach but unable to squat, crawl or climb, and had a moderate restriction of activities involving unprotected heights and a mild restriction of activities involving heavy machinery, exposure to marked changes in temperature and humidity, and driving automotive equipment.[6]  During visits in April and May of 2010, Bradbury reported some pain associated with his physical therapy.  Again, Dr. Goula made no change in his medication regime.

In July of 2010, a drug test revealed that Bradbury had been using cocaine.[7]  Dr.

---

[6] In the proceedings before the ALJ, Bradbury also claimed to suffer from Attention Deficit Hyper Disorder (ADHD). Based on the psychological opinions of the independent examiners, the ALJ concluded that Bradbury's ADHD did not rise to the level of a disability. The issue is not substantively briefed on appeal. The only allusion to a mental disability in Bradbury's appellate brief is the single, unsupported sentence: "His ability to focus due to his ADHD is exacerbated by his pain." Pet'r's Br. at 5. Consequently, the court deems the issue waived and will omit any discussion of the psychiatric record.

[7] Bradbury had also tested positive for cocaine in October of 2009.

Goula also noted that Bradbury's pill count was off. Dr. Goula informed Bradbury that he would no longer prescribe narcotics and referred him to a pain management clinic. *Id.* at 603. The record reflects no further visits with Dr. Goula. Between August and December of 2010, Bradbury received care from Dr. Robert Baratz, a primary care physician, who continued Bradbury on his previous medications.

During the May 20, 2010 disability hearing, the ALJ took testimony from Larry Tackey, a Vocational Expert (VE). The ALJ first asked Tackey whether there were jobs at the light or sedentary level for an unskilled worker. Tackey suggested occupations such as a ticket seller at a movie theater (77,000 jobs in Massachusetts); parking lot attendant (4,000 in Massachusetts); or toll collector (77,000 in Massachusetts). The ALJ then asked Tackey to review Dr. Goula's functional capacity assessment of Bradbury (acknowledging "significant lumbosacral disc disease"). Tackey testified that taking into account Bradbury's exertional and occasional reaching restrictions, he could work in such jobs as photo lab clerk (6,000 in Massachusetts); information clerk (20,000 in Massachusetts); or furniture rental consultant (6,000 in Massachusetts). Finally, the ALJ asked Tackey to consider Bradbury's testimony regarding his abilities and pain level and assume it to be credible. Tackey responded that on that basis there are no jobs in the economy that Bradbury could perform.

***The Findings of the ALJ***

On June 6, 2011, ALJ Mackay issued a decision finding Bradbury ineligible for disability benefits. In the opinion, the ALJ made the following findings.

> 1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2008.
>
> 2. The claimant has not engaged in substantial gainful activity since August 17, 2007, the amended alleged onset date (20 C.F.R. §§ 404.1571 *et seq.,* and §§ 416.971 *et seq.*).
>
> 3. The claimant has the following severe impairment: degenerative disc disease (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as deemed in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except that the claimant is able to sit, stand and/or walk for up to 1 hour at a time, is able to sit for up to 3 hours total in an 8-hour day, stand for up to 3 hours total in an 8-hour day, walk up to 2 hours total in an 8-hour day and requires a sit/stand option. The claimant is able to lift and carry up to 5 pounds and is able to use his hands for repetitive actions such as simple grasping, pushing and pulling of arms controls and fine manipulations. The claimant is unable to use both feet for repetitive movements of pushing and pulling. The claimant is able to occasionally bend and reach and never squat, crawl and climb. Finally, the claimant has a moderate restriction of activities involving unprotected heights and a mild restriction of activities involving being around machinery, exposure to marked changes in temperature and humidity and driving automotive equipment.
>
> 6. The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

7. The claimant was born on December 21,1971 and was 30 years old, which is deemed as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as deemed in the Social Security Act, from August 17, 2007, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

At the core of Bradbury's appeal is his objection to the ALJ's refusal to fully credit his testimony, particularly regarding his level of pain. Bradbury also claims that the ALJ "overemphasized" his misstatements regarding the dates of illicit drug use, testimony that clearly influenced the ALJ's credibility assessment. Pet'r's Br. at 5. The ALJ also found a material inconsistency between Bradbury's testimony regarding his daily activities and his complaints about pain-based limitations.[8] The ALJ also gave considerable weight to

---

[8] There is also evidence in the record that Bradbury plays basketball on occasion. *See* R. at 491 and 651.

the effectiveness of Bradbury's medications as reported by his doctors. "Specifically, the claimant has reported that percocet works well to alleviate his pain. Medical evidence from Dr. Goula and Dr. Baratz documents that the claimant has been stable on medication since early 2010 and that his activities have improved." R. at 14. Ultimately, the ALJ gave the greatest weight to the opinion of Dr. Goula – Bradbury's primary care physician from November of 2009, until the July 2010 drug use incident. The ALJ found Dr. Goula's reports consistent "with the claimant's level of social functioning and activities of daily living and the medical evidence documenting his positive response to medication." *Id.*

The ALJ then turned to the VE's hearing testimony. Based on Bradbury's age, education, work experience, and functional capacity, the VE had opined that Bradbury would be able to work at a number of sedentary occupations such as a "counter clerk at a photo lab . . . furniture rental consultant . . . [and] information clerk." *Id.* at 51. In sum, the ALJ found Bradbury not disabled within the meaning of 20 C.F.R. §§ 404.1520(g) and 416.920(g), and thus "not under a disability . . . under section 1614(a)(3)(A) of the Social Security Act." *Id.* at 8.

## DISCUSSION

Disability determinations follow a "sequential step analysis" mandated by 20 C.F.R. § 404.1520. The analysis requires that the ALJ first determine whether or not a

claimant was gainfully employed prior to the onset of the disabling condition. At the second step, the ALJ must determine whether a claimant suffers from a severe impairment limiting his ability to work. If the impairment is the same as, or equal in its effect to, an impairment (or combination of impairments) listed in Appendix 1 of the regulations, the claimant is presumptively deemed disabled. If the impairment is not covered by Appendix 1, the fourth step of the analysis requires that the claimant prove that his disability is sufficiently serious to preclude a return to his former occupation. If he meets that burden, the Commissioner at the fifth step is obligated to prove that there are other jobs in the national economy that the claimant is able to perform. *See Gonzalez Perez v. Sec'y of HEW*, 572 F.2d 886, 888 (1st Cir. 1978) ("[A] claimant must establish that he can no longer perform his prior vocation before the government is obligated to prove that alternative employment is available for a person in claimant's condition.").

The findings of the Commissioner are conclusive so long as they are supported by substantial evidence and the Commissioner has applied the correct legal standard. 42 U.S.C. § 405(g); *Manso-Pizarro v. Sec'y of Health and Human Servs.*, 76 F. 3d 15, 16 (1st Cir. 1996). "Substantial evidence . . . means evidence reasonably sufficient to support a conclusion. Sufficiency, of course, does not disappear merely by reason of contradictory evidence. . . . [The] question [is] not which side [the court] believe[s] is right, but whether [the ALJ] had substantial evidentiary grounds for a reasonable decision

. . . ." *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998). The Commissioner's findings, however, "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

The Social Security Act defines "disability" as the "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Act further elaborates that

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

In applying the sequential analysis, the ALJ first determined that Bradbury had not engaged in gainful activity since the time of the onset of the claimed disability. At the second step, he found Bradbury's disc disease to be a severe impairment under 20 C.F.R. §§ 404.1520(c) and 416.920(c), which causes him significant limitation in his

ability to perform basic work activities. However, at step three, the ALJ found that Bradbury did not "have an impairment or combination of impairments that meets or medically equals one of the listed impairments." R. at 11. At step four, the ALJ found Bradbury to have the Residual Functional Capacity (RFC) to perform light work, but with some limitations.[9] At the final step, the ALJ determined Bradbury to be unable to perform his previous work as a construction worker, but nonetheless, able to perform other jobs existing in significant numbers in the local and national economy.

Bradbury argues that the ALJ's decision was not supported by substantial evidence because he "mischaracterized the abilities of Bradbury with regard to his level of functioning when he discussed activities Bradbury can do during the day." Pet'r's Br. at 4. Bradbury complains that the ALJ failed to recognize that while he may ready his son for school or fold laundry, he can do so only with the use of pain medication and that these activities are "absolutely brutal" for him. Bradbury also contends that his "preparing simple meals" is not cooking at all, but rather "microwaving." R. at 41. Bradbury finally argues that because he followed a conservative treatment regime, the

---

[9] Supplemental limitations recognized by the ALJ included the need for a sit/stand option; only sitting or standing up to three hours in an eight hour day; only walking up to two hours in an eight hour day; no squatting, climbing or crawling; only occasional reaching and bending; carrying no more than five pounds; an inability to use both feet for repetitive pushing and pulling; and a moderate restriction on operating at unprotected heights.

ALJ wrongly concluded "that his medical condition is not that bad." App. Br. at 7.

The argument unfairly characterizes the ALJ's fuller description of Bradbury's testimony regarding his daily activities. *See Teixeira v. Astrue*, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) ("While a claimant's performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding."). The ALJ, for example, noted Bradbury's statement that after sending his son off to school, Bradbury "rests for most of the day." He also acknowledged Bradbury's testimony that he "experiences intense back spasms with an electric shock sensation" that are "unpredictable" requiring a "recovery" of "1 to 2 hours of lying down." R. at 12. The ALJ recognized that shopping and laundry "are difficult [for Bradbury] due to his limited ability to walk up and down stairs and reach with his arm."[10]

The ALJ's determination that Bradbury is not disabled relied more on the treating physicians' evaluations of Bradbury's response to medication (finding that Bradbury's pain was relatively well controlled) than on his account of his daily activities. Bradbury takes particular umbrage at the ALJ's remark regarding his failure

---

[10] In his colloquy with Bradbury during the administrative hearing, the ALJ asked whether to manage his shopping trips in light of his limitations he was "forced to take more trips." R. at 41. Bradbury testified, "No, more bags. . . . all small bags. All – a few items in each bag. *Id.*

15

to undergo surgery, specifically that his "treatment has also been conservative and he has not required any surgical interventions."  R. at 14.  Bradbury claims that Dr. Connelly "indicated that surgery will not benefit [him]."  Pet'r's Br. at 7.  He also points to Dr. Mansfield's statement that surgery would be a "gamble."  *Id.*  However, there is nothing inaccurate about the ALJ's statement.  Dr. Connolly's opinion was not that Bradbury would derive no benefit from surgery, but that "the likelihood of an operation significantly improving his disability *getting him back to the concrete work* is pretty close to 0 . . . ."  R. at 353.  Similarly, Dr. Mansfield's concern was the impact Bradbury's smoking habit would have on the likelihood of a successful outcome, but that if he were to quit smoking, he would be willing to operate.  Specifically, he advised Bradbury that a fusion surgery has a

> 70% - 80% success in a non-smoker and less than that in a smoker.  He understands that undertaking surgery would be a gamble.  It shouldn't be done unless he is able to stop smoking.  In the meantime he'll try another course of physical therapy and use non-steroidal anti-inflammatories.  If he decides that he is able to quit smoking and he wants to proceed I would do a four level discogram L.2-L.3 to L.5-S.1.  I told him that if more than two discs seemed to be involved he would not be a good candidate for surgery.

*Id.* at 286.  In March of 2010, Dr. Mansfield told Bradbury that they would try physical therapy and "failing that, we'd consider a three-level discogram."  *Id.* at 568.  Moreover, the ALJ relied on substantial evidence in the medical record impeaching

Bradbury's testimony that his pain amounted to a "seven out of ten, even with medication."[11]

Finally, Bradbury contends that the ALJ failed to fairly evaluate his impairments in determining his RFC for light work and that he instead "acted in an adversarial position." Pet'r's Br. at 8. In evaluating the RFC, the ALJ is to follow a two-step process to: (1) determine whether the claimant has an underlying physical or mental impairment that could reasonably be expected to produce the complained of pain or other symptoms; and (2) if such an impairment exists, the extent to which it limits his ability to perform basic work activities. This latter determination requires an evaluation

---

[11] It is evident from the content of his decision that the ALJ fully understood and applied the *so-called Avery* factors. "In determining the severity of a claimant's pain, 'the absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility.'" *Makuch v. Halter*, 170 F. Supp. 2d 117, 127 (D. Mass. 2001), quoting Social Security Ruling (SSR) 96-7p. If after evaluating the objective findings, the ALJ determines that the claimant's reports of pain are significantly greater than what could be reasonably anticipated from the objective evidence, the ALJ must consider other relevant information. *See Avery v. Sec'y of Health and Human Servs.*, 797 F.2d 19, 23 (1st Cir. 1986). Considerations capable of substantiating subjective complaints of pain include evidence of (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side effects of any medication taken to alleviate the pain or other symptoms; (5) non-medicinal treatments implemented; (6) measures employed to alleviate pain; and (7) any other factors relating to the claimant's functional limitations and restrictions due to pain. *Id.* at 29; *see also* 20 C.F.R. §§ 404.1529(c)(3)(i-vii) and 416.929(c)(3)(i-vii).

of the intensity, persistence, and limiting effects of the claimant's pain or other symptoms.[12]  *See* 20 C.F.R. §§ 404.1545(a).

At the first step of the RFC determination, as previously stated, the ALJ found Bradbury to suffer from degenerative disc disease based principally on Dr. Goula's diagnoses.  He also took into account Dr. Goula's April 2010 Medical Source Statement (MSS), which concluded that Bradbury was able to sit, stand or walk up to an hour at a time; able to sit for up to three hours in an eight-hour work day; able to stand up to three hours in an eight-hour work day; able to walk two hours in an eight-hour work day; able to carry five pounds; able to use his hands normally; and able to bend and reach occasionally.  R. at 711.  Moreover, the ALJ recognized that the MSS placed some restrictions on Bradbury's physical capabilities – an inability to use both feet normally; to squat, crawl or climb; as well as some limitations on use of machinery, exposure to temperature changes and working at unprotected heights.  *Id.* at 14.  Consistent with these limitations, the ALJ properly relied on the VE's testimony in concluding that jobs exist that Bradbury could perform in spite of his limitations.

In sum, the ALJ's decision was informed by a weighing of the entire record of

---

[12] Particular deference is afforded the ALJ in this regard as it is his duty to formulate the RFC. 20 C.F.R. § 404.1546(c)*; see also Kiklis v. Astrue*, 2011 WL 4768491, at *9 (D. Mass. Sept. 28, 2011).

the case, discounted only to the extent that the ALJ questioned aspects of Bradbury's testimony (as he was entitled to do). The ALJ appropriately gave the greatest weight to the reports of Dr. Goula who was Bradbury's principal primary care physician.[13] Because the ALJ's decision was supported by substantial evidence, it is conclusive of the matter. *See* 42 U.S.C. § 405(g); *Nguyen*, 172 F. 3d at 35.

### ORDER

For the foregoing reasons, Bradbury's motion to reverse or remand the decision of the Commissioner is <u>DENIED</u>. The Commissioner's cross-motion for an order of affirmance is <u>ALLOWED</u>. The Clerk will enter judgment for the Commissioner and close the case.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE

---

[13] Under SSA regulations, an ALJ is directed to ordinarily give "more weight" to treating physicians' opinions, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2).